UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SUMMIT TECHNOLOGIES, INC., | : | CIVIL ACTION NO.: |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SUBHAS RYON RAGHURAI, | : | |
| A.S.A.P. RESOURCE GROUP, INC., | : | |
| TAYLORED STAFFING, and | : | |
| ALVIN RAGHURAI, | : | |
| | : | |
| Defendants. | : | APRIL 2, 2009 |

## COMPLAINT

The plaintiff, Summit Technologies, Inc., by its attorneys Jorden Burt LLP, alleges for its

Complaint against the defendants, Subhas Ryon Raghurai, A.S.A.P. Resource Group, Inc.,

Taylored Staffing, and Alvin Raghurai (collectively "Defendants") as follows:

## PARTIES

1.      The plaintiff, Summit Technologies, Inc. ("Summit"), is a Connecticut

corporation, with a principal place of business located at 45 South Main Street, Suite 040, West

Hartford, Connecticut, 06107.

2.      The defendant, Subhas Ryon Raghurai ("Defendant Ryon"), is an individual and

citizen of the State of New York who, upon information and belief, resides at 4 Arborfield Way,

Lake Grove, New York, 11755.

3.      The defendant, A.S.A.P. Resource Group, Inc. ("ASAP"), is a Florida corporation with, upon information and belief, a principal place of business located at 500 Ocean Drive, 9 A West, Juno Beach, Florida 33408.

4.      The defendant, Taylored Staffing, is a Canadian corporation with, upon information and belief, a principal place of business located at 2 Regency Square, Scarborough, Ontario M1E 1N3 Canada.

5.      The defendant, Alvin Raghurai ("Defendant Alvin"), is an individual and Canadian citizen who, upon information and belief, resides at 2 Regency Square, Scarborough, Ontario M1E 1N3 Canada.  Defendant Alvin is President of Taylored Staffing and the brother of Defendant Ryon.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as the claims against Defendants arise under the laws of the United States, specifically, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1367(a) as the state law claims against Defendants are so related to the claims made pursuant to the Computer Fraud and Abuse Act that they form part of the same case or controversy under Article III of the United States Constitution.

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as there is complete diversity of citizenship between the parties and because the matter in controversy exceeds the sum of $75,000.00, exclusive of interests and costs.

9.      The Court has personal jurisdiction over Defendants because (1) this case arises out of agreements between Summit and each of the Defendants made or to be performed in the

State of Connecticut; (2) Defendants transact business within the State of Connecticut; (3)

Defendants have committed tortious acts in this State; (4) Defendants have committed tortious

acts outside the State causing injury within the State; (5) and Defendants have derived substantial

revenue from goods and/or services rendered in the State and from interstate commerce.

      10.     Venue is proper in the United States District Court for the District of Connecticut

pursuant to 28 U.S.C. § 1391 as a substantial part of the events or omissions giving rise to these

claims occurred in this judicial district.

## BACKGROUND AND FACTS COMMON TO ALL COUNTS

      11.     This case involves the unlawful and unfair competitive conduct by Defendants.

Summit commenced this lawsuit to protect its legitimate business interests and to recover

significant losses caused by Defendants' deceitful conduct.

      12.     Summit is an information technology services company that provides

infrastructure, software development, and information assurance solutions to the Federal

Government and Fortune 1000 companies.  A significant portion of Summit's business

operations involves providing technology-based staffing services ("IT staffing services") to the

Federal Government in connection with Government-authorized projects, primarily as a

subcontractor to various prime systems integrators and vendors.

      13.     In this regard, Summit works closely with the prime vendor of IT services for

purposes of providing custom IT staffing services for a particular project by locating, recruiting,

and coordinating appropriate IT personnel to staff the project and meet the goals outlined by the

particular project and/or requirements.

      14.     The business of providing IT staffing services to the Government and to other

private enterprises is highly competitive in that numerous staffing companies compete for

customer requests and for personnel talent.  As such, confidential information about prospects,

requirements, and specifications, as well as Summit's internal pricing and margin structure,

quoting procedures, and business model, are critical to Summit's business operations and

maintaining client relationships.

15.    Over the years, Summit has provided superior IT staffing services and developed

considerable goodwill in the industry.  As a result, Summit has been placed on approved prime

vendor lists.  Such status readily identifies Summit to the prime vendor of IT services as an

approved company with which to work and provides Summit with an initial opportunity to fulfill

the prime's IT staffing requirements on a particular project.

16.    Additionally, the United States Department of Defense has granted Summit a

Facilities Clearance at the "Top Secret" level.  As a result of this Top Secret clearance, Summit

is in a unique position to provide IT staffing services in connection with various Government

projects that would not otherwise be available to it given the limited access allowed by the

Government to many of its confidential and security-based projects.

17.    Due to its unique position of providing IT staffing services in connection with

confidential Government and security-based projects, Summit has identified, located, and

recruited various personnel who also possess similar clearance levels and thus are uniquely

qualified to perform IT security functions for the Government.  Over the years and through its

business operations, Summit has developed a unique and highly confidential list identifying such

personnel, which list is not readily publically available.  Summit is able to call upon this unique

information when providing its services, thereby giving it a competitive advantage in the

industry.

18.     Over the years and through the course of its business operations, Summit has expended a tremendous amount of resources in locating, recruiting, and placing qualified personnel in connection with providing superior custom IT staffing services to various different clients for various different projects.  As a result, Summit has compiled and developed a comprehensive database of personnel.

19.     As this information is critical to Summit's core business operations, Summit custom developed the Sales Tracking And Recruiting System ("STARS") computer software program to properly manage and maintain this information.  STARS is a highly proprietary software system that was developed internally and tailored to the sales and recruiting requirements which are unique to Summit's business operations.  For example, it tracks orders from clients, rates of different candidates or contractors, provides a salary calculator, an automatic margin calculator, information concerning salespeople and different candidates. STARS also provides internal and direct access to the various on-line job boards that Summit pays to subscribe to, and information from those job boards is tied to and captured by the system.

20.     Summit expends a substantial amount to subscribe to the various on-line job boards, including CareerBuilder.com, Monster.com, and Dice.com, as these are a critical resource in assisting Summit to locate and recruit appropriate IT personnel to staff client projects and/or requirements.

21.     Summit also created the Candidate Tracking System ("CTS"), a proprietary system custom developed to maintain and manage unique information concerning specific candidates (also referred to generally as contractors) collected over the years.  Such information includes, but is not limited to: a history of the candidate and contact information; resumes; which

projects he may have been recommended for; whether he was hired; references; any issues that may have arisen; and internal notes concerning the candidate.

22.     Summit also developed a comprehensive budget template used to identify and forecast revenues and expenses based on, _inter alia_, valuable historical data such as average billable hours and billing rates for each client in particular markets.  This template is a proprietary system that Summit custom developed in order to maintain financial information in a manner that is unique to Summit's business operations.

23.     These internal confidential systems and the information contained therein are the result of years of providing custom IT staffing services in the industry.  Summit's use of this proprietary information is critical to its business operations and success.

## Defendants' Relationship with Summit

24.     Defendant Ryon was employed at will by Summit as Vice President of Sales and Alliances from December 2002 to March 2009.

25.     Defendant Ryon was hired by Summit for purposes of increasing sales. Defendant Ryon was well compensated, received excellent benefits, and drove a luxury company car.  Defendant Ryon was subsequently issued shares of Summit stock which equal to twenty-five percent (25%) of all outstanding stock in Summit.  The grant of that stock did not cost Defendant Ryon any money.

26.     By virtue of Defendant Ryon's employment, Summit's confidential, proprietary, and trade secret information, including but not limited to, financial information, identity of candidates or contractors, client lists, names and requirements, supplier and distributor data, process, purchasing, sales and pricing practices, business strategies and plans, necessarily had to be disclosed to Defendant Ryon in order that he be able to perform his duties as an employee and

officer of Summit.  This information, created and maintained by Summit, is a valuable asset
belonging to Summit.

27.     Thus, to ensure the protection of Summit's confidential, proprietary and trade
secret information, Summit required Defendant Ryon, at the time he was hired, to sign a
Confidentiality and Non-Competition Agreement.

28.     Prior to commencing his employment with Summit, Defendant Ryon executed the
Confidentiality and Non-Competition Agreement pursuant to which Defendant Ryon expressly
agreed not to disclose or use Summit's confidential and proprietary information.  Specifically,
the Confidentiality and Non-Competition Agreement provides as follows:

> During the term of my employment, and at all time thereafter, I will not directly,
> or indirectly, for myself or in conjunction with or on behalf of any other person
> or entity except SUMMIT:
>
> Furnish, divulge or make accessible to any competing business or person or
> entity outside of SUMMIT, or use on my own behalf, any confidential
> information of SUMMIT, including, but not limited to, the identity of
> customers, purchasing, sales and pricing practices. . . .

29.     Pursuant to the Confidentiality and Non-Competition Agreement, Defendant
Ryon expressly acknowledged the existence of Summit's confidential, proprietary, and trade
secret information.

30.     Pursuant to the Confidentiality and Non-Competition Agreement, Defendant
Ryon expressly agreed not to compete with Summit or solicit the business of Summit customers
during the term of his employment and for a period of one (1) year following the date of his
termination.  Specifically, the Confidentiality and Non-Competition Agreement provides as
follows:

> During the term of my employment with SUMMIT, and for a period of one (1)
> year following the date of termination of my employment with SUMMIT . . . I

will not directly, or indirectly, for myself or in conjunction with or on behalf of any other person or any entity except SUMMIT, contract to perform or perform any of the following acts:

Calling upon any current customer of SUMMIT, or any customer of SUMMIT then existing as of the date of my termination, for the purpose of soliciting business, or in any way soliciting, diverting or taking away, or attempting to take away, any such customers of SUMMIT or any of the patronage of business of such customers, or in any way soliciting any person, business or entity which SUMMIT has been actively attempting to obtain as a customer during the twelve (12) month period prior to the date of my termination.

31.     Pursuant to the Confidentiality and Non-Competition Agreement, Defendant Ryon further acknowledged and agreed that the restrictions set forth therein are reasonable and that any breach by Defendant Ryon of any of the promises set forth in the Confidentiality and Non-Competition Agreement may not be reasonably or adequately compensated by damages. Accordingly, Defendant Ryon expressly agreed that, in the event of a breach of the terms of the Confidentiality and Non-Competition Agreement,  Summit would be entitled to injunctive or other equitable relief against Defendant Ryon and all other appropriate relief against him to prevent any breach of the Agreement.

32.     At the time he was hired, Defendant Ryon was provided a Policy and Procedure Manual which further described the policies and procedures governing the use and disclosure of Summit's confidential and proprietary information.  Defendant Ryon expressly acknowledged in writing his receipt and knowledge of these materials and his obligation to abide by the policies and procedures contained in the Manual.  Specifically, the Policy and Procedure Manual contains a section entitled "Confidentiality.  Obligation to Summit" which provides as follows:

The inner workings of Summit are considered confidential information.  Expect under court order or subpoena, disclosure of internal information that could potentially reduce the competitive edge of the company, including financial status, personnel strength, company procedures and policies, client and prospective client data, and contract and project data, is considered a grievous

violation of trust and is grounds for disciplinary action, up to and including termination.

33.     Additionally, as set forth in the section entitled "Code-of-Conduct," the Policy and Procedure Manual specifically required that Defendant Ryon conduct himself with the highest moral and ethical standards and to honor Summit's as well as its clients' policies.

34.     Over the course of his employment, Defendant Ryon traveled numerous times to and attended meetings in Connecticut, and maintained close contact with Summit's Connecticut office by way of numerous telephone conversations, electronic mail, mail, and facsimile communications in the normal course of his employment. Defendant Ryon further received his salary, and expense reimbursements from Summit's office in Connecticut. Additionally, Summit provided Defendant Ryon with a luxury company car, which car is owned by and registered to Summit in Connecticut and has been issued a Connecticut license plate.

35.     Taylored Staffing and its President, Defendant Alvin, first became associated with Summit in March 2005 at the request of Defendant Ryon, who is Defendant Alvin's brother. Upon information and belief, Defendant Alvin is the sole person involved in and responsible for the entity Taylored Staffing and further exercises sole control over the entity.

36.     On or about March 5, 2005, Taylored Staffing and Summit entered into a General Contractor Agreement whereby Defendant Alvin, through Taylored Staffing, would provide technology consulting services to Summit, more specifically, recruitment services. Prior to his association with Summit, Defendant Alvin had no previous experience with the staffing industry or with the recruitment for staffing services, but rather learned all aspects of staffing and recruitment through his work with Summit.

37.     By virtue of Taylored Staffing and Defendant Alvin's association with Summit, Summit's confidential, proprietary, and trade secret information, including but not limited to,

financial information, identity of candidates or contractors, client lists, names and requirements, supplier and distributor data, process, purchasing, sales and pricing practices, business strategies and plans, necessarily had to be disclosed to Defendant Alvin in order that he be able to perform his duties. This information, created and maintained by Summit, is a valuable asset belonging to Summit.

38.     Thus, to ensure the protection of Summit's confidential, proprietary and trade secret information, the General Contractor Agreement contained a Confidentiality provision which expressly prohibits Taylored Staffing, either during the term of the Agreement or at any time thereafter, from using for itself or others, divulging, or conveying any of Summit's secret or confidential information, or any knowledge or data it obtained relating to Summit or any of Summit's clients.

39.     The General Contractor Agreement contained a Non-competition provision whereby Taylored Staffing and Defendant Alvin further expressly agreed "that during the term of this Agreement and for one year thereafter, [Taylored Staffing] shall not solicit or perform any services for any [Summit client], which has received the services of [Taylored Staffing] personnel pursuant to the terms of this Agreement."

40.     Pursuant to the General Contractor Agreement, Taylored Staffing and Defendant Alvin further acknowledged and agreed that the restrictions set forth therein are reasonable and that any breach would cause Summit irreparable harm. Accordingly, they expressly agreed that, "in addition to any other remedies available to Summit, injunctive relief may be sought to restrain any such breach, whether threaten[ed] or actual."

41.     The General Contractor Agreement was entered into in Connecticut and was to be performed in Connecticut. Additionally, over the course of their association with Summit,

Taylored Staffing and Defendant Alvin maintained close contact with Summit's Connecticut office by way of numerous telephone conversations, electronic mail, mail, and facsimile communications in the normal course of business. They further received payment for his services from Summit's office in Connecticut.

42.     In or about June 2008, Defendant Ryon insisted on transferring the Unisys Corporation sales account and responsibilities to his brother, Defendant Alvin, under the pretext that this would provide Defendant Ryon the opportunity to pursue and develop new clients on behalf of Summit. Defendant Alvin officially made the transition from recruitment to sales effective January 2009.

43.     ASAP first became associated with Summit in June 2006 at the request of Defendant Ryon. On or about June 6, 2006, Summit and ASAP entered into a General Contractor Agreement whereby ASAP would provide technology consulting services to Summit, more specifically, background recruitment services at times when there was an overflow of recruitment work.

44.     By virtue of ASAP's association with Summit, certain of Summit's confidential, proprietary, and trade secret information, including but not limited to, identity of candidates or contractors, client lists, names and requirements, and supplier and distributor data necessarily had to be disclosed to ASAP in order that it be able to perform its duties. This information, created and maintained by Summit, is a valuable asset belonging to Summit.

45.     Thus, to ensure the protection of Summit's confidential, proprietary and trade secret information, the General Contractor Agreement contained a Confidentiality provision which expressly prohibits ASAP, either during the term of the Agreement or at any time thereafter, from using for itself or others, divulging, or conveying any of Summit's secret or

confidential information, or any knowledge or data it obtained relating to Summit or any of Summit's clients.

46.     The General Contractor Agreement contained a Non-competition provision whereby ASAP further expressly agreed "that during the term of this Agreement and for one year thereafter, [ASAP] shall not solicit or perform any services for any [Summit client], which has received the services of [ASAP] personnel pursuant to the terms of this Agreement."

47.     Pursuant to the General Contractor Agreement, ASAP further acknowledged and agreed that the restrictions set forth therein are reasonable and that any breach would cause Summit irreparable harm. Accordingly, it expressly agreed that, "in addition to any other remedies available to Summit, injunctive relief may be sought to restrain any such breach, whether threaten[ed] or actual."

48.     The General Contractor Agreement was entered into in Connecticut and was to be performed in Connecticut. Additionally, over the course of its association with Summit, ASAP maintained close contact with Summit's Connecticut office by way of numerous telephone conversations, electronic mail, mail, and facsimile communications in the normal course of business. It further submitted invoices for payment for services rendered to Summit's office in Connecticut and received payment from Summit's office in Connecticut.

## Unisys Corporation

49.     Since 1997, Summit has been providing IT staffing services to Unisys Corporation ("Unisys"), a global information technology services and solutions company. Over the years, Summit has worked closely with Unisys on various projects.

50.     In or around 2001 with the formation of the Transportation Security Administration ("TSA") following the terrorist attacks of September 11, Summit has worked

12

closely with Unisys and provided IT staffing services in order to assist in delivering
comprehensive integration services to the TSA in connection with a TSA initiative launched
following the attacks of September 11.  Specifically, this multi-year initiative set out to improve
TSA's overall IT security posture by upgrading its existing infrastructure with newer
technologies and improving its operation processes and procedures.

51.     The business with Unisys constitutes a significant portion of Summit's business,
and constitutes an appreciable percentage of Summit's total annual revenue.

52.     While employed as Vice President of Sales and Alliances for Summit, Defendant
Ryon was responsible for the Unisys account and for further developing and maintaining the
client relationship and business.

### Defendants' Inappropriate Conduct

53.     In or around late summer to early fall of 2008, although Defendant Ryon was able
to secure some new customers, revenues generated by Defendant Ryon's sales efforts began to
decline and he was in less and less frequent contact with Summit.

54.     On or about March 2, 2009, Summit discovered that Defendant Alvin was using
the email address alvin.raghurai@asapresourcegroup.com, apparently issued by ASAP.
Specifically, he had set up a meeting with ASAP on Defendant Ryon's electronic calendar using
an "@asapresourcegroup.com" email address rather than his Summit email address of
araghurai@summtech.com.

55.     Upon information and belief, Defendants were using Summit's own client
information, pricing procedures, business model, and other internal proprietary and trade secret
information for their own benefit to directly compete with Summit in the IT staffing services
industry.

13

56.     On or about March 4, 2009, Defendant Ryon contacted Summit in order to discuss his separation from the company.  The next day, on March 5, 2009, Defendant Ryon traveled to Summit's Connecticut office and participated in a meeting with Summit's three other officers, specifically, Summit's President Paul Patel, Vice President Christopher Calma, and Chief Financial Officer Smita Patel.

57.     During this meeting, Defendant Ryon communicated his frustration in that he believed he should be earning substantially more money (he had previously requested an increase of $75,000 to his already $225,000 yearly salary, which request was denied).  He proposed separating from Summit upon the following terms:  he would take and maintain the Unisys sales account (one of Summit's top sales accounts) under a separate P&L to be tracked as a division of Summit; use the Summit Technologies name; use Summit's access to the approved vendor list; use Summit's Facilities Clearance granted to it by the U.S. Department of Defense; have and use copies of STARS and CTS; and Summit would pay him for his shares in the company.

58.     At the March 5 meeting, Defendant Ryon was questioned about the use of the "@asapresourcegroup.com" email address.  Defendant Ryon disingenuously replied that what he did outside of Summit was of no concern to Summit.

59.     Given the strained relationship with Defendant Ryon, his unreasonable demands, and his implicit acknowledgment of his unlawful competitive conduct, Summit terminated Defendant Ryon's employment on March 6, 2009.

60.     On March 6, 2009, Summit also terminated the General Contractor Agreement with Taylored Staffing and terminated its relationship with Defendant Alvin.

61.     In early March 2009, the General Contractor Agreement with ASAP and its business relationship with Summit was also terminated.

62.     Upon information and belief, Defendants were deceptively working in concert with one another to establish and develop a staffing business to directly compete with Summit, while at the same time being employed by and/or associated with Summit and diverting business away from Summit.

63.     Upon further investigation of Defendants' conduct, Summit discovered that Defendant Ryon, while employed by Summit as Vice President of Sales and Alliances, and Defendant Alvin, while associated with and providing services for Summit through Taylored Staffing, were actively working with ASAP and diverting business away from Summit.  In doing so, they portrayed themselves as being representatives of ASAP and part of a new venture.

64.     Additionally, Defendants Ryon and Alvin improperly and actively emailed ASAP highly confidential, proprietary, and trade secret information, including but not limited to, Summit's internal pricing and margin structure, quoting procedures, business model, financial information, and information about clients, prospects, requirements, and specifications, all of which are critical to Summit's business operations and maintaining client relationships.  They did so initially by using personal email accounts and subsequently through "@asapresourcegroup.com" email addresses.

65.     Upon information and belief, Summit's clients and customers are currently being contacted and solicited by Defendants in an effort to divert business away from Summit for their own benefit.

66.     Defendants' conduct is in direct violation of their obligations expressly set forth in their respective agreements.

67.     Upon information and belief, Defendants Ryon and Alvin inappropriately and improperly accessed Summit's STARS and CTS computer systems for purposes of obtaining Summit's confidential, proprietary, and trade secret information in order to disseminate and disclose, and did disseminate and disclose, the information to ASAP for their own purposes and benefit, and to the detriment of Summit.

68.     Upon information and belief, Defendants Ryon and Alvin inappropriately disclosed and continue to disclose Summit's confidential, proprietary, and trade secret information, including but not limited to, financial information, identity of contractors, client lists, names and requirements, supplier and distributor data, process, purchasing, sales and pricing practices, and business strategies and plans, to ASAP for their own purposes and benefit, and failed to protect said information from use and disclosure in violation of their agreements with Summit.

69.     To date, and despite requests to do so, Defendant Ryon has failed to return any of Summit's confidential, proprietary, and trade secret information or other documents in his possession relating to Summit as required by the Confidentiality and Non-Competition Agreement, and upon information and belief, continues to use said information for his own purposes and benefit.

70.     To date, and despite requests to do so, Defendant Ryon has failed to return Summit's personal property in his possession as required by the Confidentiality and Non-Competition Agreement, and upon information and belief, continues to use said property for his own purposes and benefit.

71.   Summit has not authorized Defendants, either orally or in writing, to use its confidential and proprietary information, or to solicit the business of any Summit client or customer.

72.   The provisions of the Confidentiality and Non-Competition Agreement and the General Contractor Agreements are necessary and crucial to Summit's business if it is to protect and maintain its customer relationships and goodwill and in preventing misappropriation by employees and competitors.

## FIRST COUNT
### (Violation of the Computer Fraud and Abuse Act)
### (Against All Defendants)

73.   Summit incorporates the allegations contained in Paragraphs 1 through 72 of this Complaint as if fully set forth herein.

74.   Upon information and belief, Defendants Ryon and Alvin intentionally accessed Summit's STARS and CTS computer systems for purposes of obtaining Summit's confidential, proprietary, and trade secret information for the improper purpose of disseminating, disclosing, and using the information for their own purposes and benefit.

75.   Defendants Ryon and Alvin's access was unauthorized and/or exceeded their authorized access.

76.   Upon information and belief, ASAP, and through Defendants Ryon and Alvin who were either employed by or otherwise associated with ASAP and acting on its behalf, intentionally accessed Summit's STARS and CTS computer systems for purposes of obtaining Summit's confidential, proprietary, and trade secret information for the improper purpose of disseminating, disclosing, and using the information for its own purposes and benefit.

77.   ASAP's access was unauthorized and/or exceeded its authorized access.

78.     Upon information and belief, Taylored Staffing, through Defendant Alvin, intentionally accessed Summit's STARS and CTS computer systems for purposes of obtaining Summit's confidential, proprietary, and trade secret information for the improper purpose of disseminating, disclosing, and using the information for its own purposes and benefit.

79.     Taylored Staffing's access was unauthorized and/or exceeded its authorized access.

80.     Defendants intentionally accessed Summit's computer system and, upon information and belief, its proprietary STARS system which provides internal and direct access to the various on-line job boards that Summit pays to subscribe to, for purposes of searching and obtaining information from Summit's CareerBuilder.com account.  Defendants accessed and downloaded so much information that they froze and shut down Summit's account, denying Summit access and use of its own account.

81.     As recently as the end of March 2009, Defendants intentionally attempted to access and use Summit's on-line job boards accounts for purposes of searching and obtaining information.  As a result of Defendants numerous attempts to access the system (which is password protected), Summit's accounts were frozen and Summit was denied access and use of its own accounts.

82.     As a direct result of Defendants' unauthorized access, Summit was unable to access or use these resources, severely impairing Summit's recruiters' ability to perform their duties.

83.     As a direct and proximate result of Defendants' conduct, Summit incurred losses in connection with the interruption of its computer service and access to the job boards, and costs well in excess of $5,000 in damage assessment and remedial measures incurred by

management in dealing and rectifying the situation lost revenue, and loss of business opportunities resulting from the interruption of service.

84.     As a direct and proximate result of Defendants' conduct and impairment to the integrity of Summit's technology systems, Summit has been damaged.

85.     As a direct and proximate result of Defendants' conduct and impairment to the integrity and availability and interruption of Summit's access to the job boards, Summit has been damaged.

86.     Through the foregoing conduct, Defendants are in violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030(a)(2)(C) and 1030(a)(5).

**SECOND COUNT**
**(Breach of Contract)**
**(Against Defendant Ryon)**

87.     Summit incorporates the allegations contained in Paragraphs 1 through 86 of this Complaint as if fully set forth herein.

88.     Summit and Defendant Ryon entered into a Confidentiality and Non-Competition Agreement, which was supported by fair and adequate consideration and constitutes a valid and binding obligation between the parties.

89.     Defendant Ryon breached the Confidentiality and Non-Competition Agreement by, inter alia: failing to perform his duties and obligations to Summit diligently, competently, and in good faith; using and disclosing Summit's contractually protected confidential, proprietary, and trade secret information to ASAP and by using this protected information for his own benefit; competing with and actively soliciting business away from Summit; failing and refusing to return Summit's trade secret, confidential, and proprietary information as well as

other Summit property in his possession, custody, or control; and interfering with the contracts

and relationships between Summit and its customers, for his own benefit and for the benefit of

all Defendants.

90.     Summit has fully performed its contractual obligations to Defendant Ryon and

satisfied all conditions precedent, if any, to Summit's right to recover under the Confidentiality

and Non-Competition Agreement.

91.     As a direct and proximate result of Defendant Ryon's breach of the

Confidentiality and Non-Competition Agreement, Summit has been damaged.

92.     Additionally, Defendant Ryon's breach of the Confidentiality and Non-

Competition Agreement was intentional, malicious, wanton, and done with reckless indifference

to Summit's interests, thereby entitling Summit to recover punitive damages, attorneys' fees, and

costs.

### THIRD COUNT
**(Breach of Covenant of Good Faith and Fair Dealing)**
**(Against Defendant Ryon)**

93.     Summit incorporates the allegations contained in Paragraphs 1 through 92 of this

Complaint as if fully set forth herein.

94.     Defendant Ryon breached his covenant of good faith and fair dealing by, <u>inter</u>

<u>alia</u>: willfully and intentionally breaching the Confidentiality and Non-Competition Agreement

and the covenants set forth therein; willfully and maliciously breaching his duty of loyalty to

Summit; intentionally violating the obligations set forth in the Policy and Procedure Manual; and

willfully misappropriating Summit's trade secret, confidential, and proprietary information for

his own benefit and for the benefit and competitive advantage of all Defendants.

95.     As a direct and proximate result of Defendant Ryon's breach of the covenant of good faith and fair dealing, Summit has been damaged.

## FOURTH COUNT
### (Breach of Duty of Loyalty)
### (Against Defendant Ryon)

96.     Summit incorporates the allegations contained in Paragraphs 1 through 95 of this Complaint as if fully set forth herein.

97.     As an employee with access to and knowledge of Summit's computer and technology systems and its confidential, proprietary, and trade secret information, Defendant Ryon owed a duty of loyalty to Summit, his employer.

98.     As an employee, Defendant Ryon's conduct was governed by Summit's policies and procedures as set forth in the Policy and Procedure Manual.

99.     Defendant Ryon intentionally breached his duty of loyalty while employed by Summit by, inter alia: exceeding his authorized access to Summit's STARS and CTS computer systems for purposes of obtaining Summit's confidential, proprietary, and trade secret information for the improper purpose of disseminating, disclosing, and using the information for their own purposes and benefit; failing to protect said information from use and disclosure; and failing to return any of Summit's trade secret, confidential, and proprietary information in his possession or control, as well as other Summit property in his possession, as requested and required by the Confidentiality and Non-Competition Agreement.

100.     Defendant Ryon intentionally breached his duty of loyalty by, inter alia, at the same time he was employed by Summit, Defendant Ryon was also working with ASAP and diverting business away from Summit.

101.   As a direct and proximate result of Defendant Ryon's breach of his duty of loyalty, Summit has been damaged.

### FIFTH COUNT
**(Breach of Fiduciary Duty)**
**(Against Defendant Ryon)**

102.   Summit incorporates the allegations contained in Paragraphs 1 through 101 of this Complaint as if fully set forth herein.

103.   As an executive of Summit, specifically Vice President of Sales and Alliances, and as a shareholder, Defendant Ryon owed a fiduciary duty to Summit.

104.   Defendant Ryon intentionally breached his fiduciary duty to Summit by, <u>inter alia</u>: failing and refusing to perform his responsibilities and duties in good faith to the detriment of Summit; intentionally interfering with and jeopardizing Summit's relationships with its clients to the detriment of Summit and its shareholders; willfully misappropriating Summit's trade secret, confidential, and proprietary information for his own benefit and for the benefit and competitive advantage of all Defendants to the detriment of Summit and its shareholders; and failing and refusing to return any of Summit's trade secret, confidential, and proprietary information or other Summit property in his possession, custody, or control as requested and required by the Confidentiality and Non-Competition Agreement.

105.   Defendant Ryon acted in direct contravention of the undivided duty of loyalty, care, and trust, which as a fiduciary, he owed to Summit and his fellow shareholders.

106.   By working with ASAP and diverting business away from Summit for purposes of personally profiting therefrom while employed by Summit at the same time, Defendant Ryon engaged in self-dealing and failed to act in good faith toward Summit.

107.    As a direct and proximate result of Defendant Ryon's wrongful conduct and breach of fiduciary duty, Summit has been damaged.

## SIXTH COUNT
### (Breach of Contract)
### (Against Taylored Staffing)

108.    Summit incorporates the allegations contained in Paragraphs 1 through 107 of this Complaint as if fully set forth herein.

109.    Summit and Taylored Staffing entered into a General Contractor Agreement, which was supported by fair and adequate consideration and constitutes a valid and binding obligation between the parties.

110.    Taylored Staffing, through the intentional and tortious conduct of its President, Defendant Alvin, breached the General Contractor Agreement by, inter alia: failing to perform its duties and obligations to Summit diligently, competently, and in good faith; using and disclosing Summit's contractually protected confidential, proprietary, and trade secret information to ASAP and by using this protected information for its own benefit; competing with and actively soliciting business away from Summit; and interfering with the contracts and relationships between Summit and its customers, for its own benefit and for the benefit of all Defendants.

111.    Summit has fully performed its contractual obligations to Taylored Staffing and satisfied all conditions precedent, if any, to Summit's right to recover under the General Contractor Agreement.

112.    As a direct and proximate result of Taylored Staffing's breach of the General Contractor Agreement, Summit has been damaged.

113.    Additionally, Taylored Staffing's breach, through Defendant Alvin, of the General Contractor Agreement was intentional, malicious, wanton, and done with reckless indifference to Summit's interests, thereby entitling Summit to recover punitive damages, attorneys' fees, and costs.

## SEVENTH COUNT
### (Breach of Covenant of Good Faith and Fair Dealing)
### (Against Taylored Staffing)

114.    Summit incorporates the allegations contained in Paragraphs 1 through 113 of this Complaint as if fully set forth herein.

115.    Taylored Staffing, through the intentional and tortious conduct of its President, Defendant Alvin, breached its covenant of good faith and fair dealing by, inter alia: willfully and intentionally breaching the General Contractor Agreement and the covenants set forth therein as well as by willfully misappropriating Summit's trade secret, confidential, and proprietary information for its own benefit and for the benefit and competitive advantage of all Defendants.

116.    As a direct and proximate result of Taylored Staffing's breach of the covenant of good faith and fair dealing, Summit has been damaged.

## EIGHTH COUNT
### (Breach of Contract)
### (Against ASAP)

117.    Summit incorporates the allegations contained in Paragraphs 1 through 116 of this Complaint as if fully set forth herein.

118.    Summit and ASAP entered into a General Contractor Agreement, which was supported by fair and adequate consideration and constitutes a valid and binding obligation between the parties.

119.    ASAP breached the General Contractor Agreement by, <u>inter alia</u>: failing to perform its duties and obligations to Summit diligently, competently, and in good faith; using and disclosing Summit's contractually protected confidential, proprietary, and trade secret information for its own benefit; competing with and actively soliciting business away from Summit; and interfering with the contracts and relationships between Summit and its customers, for its own benefit and for the benefit of all Defendants.

120.    Summit has fully performed its contractual obligations to ASAP and satisfied all conditions precedent, if any, to Summit's right to recover under the General Contractor Agreement.

121.    As a direct and proximate result of ASAP's breach of the General Contractor Agreement, Summit has been damaged.

122.    Additionally, ASAP's breach of the General Contractor Agreement was intentional, malicious, wanton, and done with reckless indifference to Summit's interests, thereby entitling Summit to recover punitive damages, attorneys' fees, and costs.

**NINTH COUNT**
**(Breach of Covenant of Good Faith and Fair Dealing)**
**(Against ASAP)**

123.    Summit incorporates the allegations contained in Paragraphs 1 through 122 of this Complaint as if fully set forth herein.

124.    ASAP breached its covenant of good faith and fair dealing by, <u>inter alia</u>: willfully and intentionally breaching the General Contractor Agreement and the covenants set forth

therein as well as by willfully misappropriating Summit's trade secret, confidential, and proprietary information for its own benefit and for the benefit and competitive advantage of all Defendants.

125.    As a direct and proximate result of ASAP's breach of the covenant of good faith and fair dealing, Summit has been damaged.

**TENTH COUNT**
**(Tortious Interference with Business Relations)**
**(Against All Defendants)**

126.    Summit incorporates the allegations contained in Paragraphs 1 through 125 of this Complaint as if fully set forth herein.

127.    By servicing, soliciting, and/or contracting with Summit's customers in contravention of their respective contractual obligations for their own benefit and competitive advantage, by doing so through the use of their association and/or employment with Summit, Defendants without justification or excuse have unlawfully and tortiously interfered with Summit's business relations.

128.    Defendants' interference was accomplished by improper and inappropriate means.

129.    Defendants acted maliciously and with intent to harm Summit, or with conscious indifference to the consequences of their actions.

130.    Summit has suffered injury as a direct and proximate result of Defendants' willful and tortious interference with Summit's business relations, and is entitled to recover compensatory damages, as well as punitive damages, attorneys' fees, and costs.

## ELEVENTH COUNT
### (Tortious Interference with Prospective Advantage)
### (Against All Defendants)

131.   Summit incorporates the allegations contained in Paragraphs 1 through 130 of this Complaint as if fully set forth herein.

132.   By making use of Summit's contractually protected confidential information for their own personal benefit and competitive advantage to the detriment of Summit and by servicing, soliciting, and/or contracting with Summit's customers, Defendants, without justification or excuse, have unlawfully and tortiously interfered with Summit's prospective advantage with its potential clients and business relationships.

133.   Defendants' interference was accomplished by improper and inappropriate means.

134.   Defendants acted maliciously and with intent to harm Summit, or with conscious indifference to the consequences of their actions.

135.   Summit has suffered injury as a direct and proximate result of Defendants' willful and tortious interference with Summit's business expectancies, and is entitled to recover compensatory damages, as well as punitive damages, attorneys' fees, and costs.

## TWELFTH COUNT
### (Violation of the Connecticut Uniform Trade Secrets Act)
### (Against All Defendants)

136.   Summit incorporates the allegations contained in Paragraphs 1 through 135 of this Complaint as if fully set forth herein.

137.   By virtue of their employment and/or contractor relationship with Summit and in furtherance of their duties, Defendants had access to and used Summit's confidential, proprietary, and trade secret information.

138.   Defendants misappropriated, used, and disclosed Summit's confidential, proprietary, and trade secret information by improper means for their own personal benefit and/or business purposes and competitive advantage.

139.   Summit took reasonable steps to maintain the secrecy of its confidential, proprietary, and trade secret information, including but not limited to, requiring all employees to sign Confidentiality and Non-Competition Agreements, requiring all employees to acknowledge their understanding of the obligations set forth in the Policy and Procedure Manual, requiring all third party contractors to execute the General Contractor Agreement, pursuant to which employees and contractors agree to keep confidential and not disclose Summit's confidential, proprietary and trade secret information.  Further, Summit's internal computer systems, including STARS and CTS, are password protected, which passwords are only provided to employees.

140.   Defendants' disclosure, retention, use, and possession of Summit's confidential, proprietary, and trade secret information constitute a violation of the Connecticut Uniform Trade Secrets Act, C.G.S. §§ 35-50 through 35-58 ("CUTSA").

141.   Summit has been damaged as a direct and proximate result of Defendants' conduct.

142.   As a result of the foregoing, Summit is entitled to injunctive relief, and is entitled to recover damages, including punitive damages, attorneys' fees, and costs.

### THIRTEENTH COUNT
**(Conversion)**
**(Against Defendant Ryon and Defendant Alvin)**

143.   Summit incorporates the allegations contained in Paragraphs 1 through 142 of this Complaint as if fully set forth herein.

144.     To date, and despite requests to do so, Defendant Ryon has failed to return any of Summit's property in his possession, custody, or control, including but not limited to, confidential, proprietary, and trade secret information, notes, plans, identities of candidates or contractors, customer lists, corporate records, price sheets, technical information, and other documents related to Summit.  Defendant Ryon has further failed to return computer equipment, printers, telephones, and a luxury company car purchased by Summit.

145.     Summit is the rightful owner of all such property.

146.     To date, and despite requests to do so, Defendant Alvin has failed to return Summit's property in his possession, including but not limited to, several telephones and a key company car owned by Summit.

147.     Summit is the rightful owner of all such property.

148.     Defendants Ryon and Alvin's unauthorized and improper conduct has deprived Summit of its property, thereby wrongfully excluding Summit from exercising its right of ownership, possession, and control over such property.

149.     As a direct and proximate result of Defendants Ryon and Alvin's conduct, Summit has been damaged.

### FOURTEENTH COUNT
**(Violation of the Connecticut Uniform Trade Practices Act)**
**(Against All Defendants)**

150.     Summit incorporates the allegations contained in Paragraphs 1 through 149 of this Complaint as if fully set forth herein.

151.     At all relevant times, Defendants have been, and continue to be, engaged in the conduct of trade or commerce, as defined in section 42-110a(4) of the Connecticut General Statutes.

152.    The foregoing conduct by Defendants constitutes unfair competition or unfair deceptive acts or practices, or both, in the conduct of trade or commerce, and thereby constitutes a violation of the Connecticut Unfair Trade Practices Act, C.G.S. §§ 42-110a through 42-110q ("CUTPA").

153.    Summit has suffered an ascertainable loss of money or property as a result of Defendants' violations of CUTPA, as previously set forth and is entitled to recover damages, including punitive damages and attorneys' fees and costs.

154.    In accordance with the mandates of CUTPA, Summit will advise the Attorney General of the State of Connecticut, as well as the Commissioner of Consumer Protection for the State of Connecticut, of its CUTPA claim against Defendants by mailing a copy of this Complaint to each respective office.

## REQUEST FOR RELIEF

WHEREFORE, the plaintiff, Summit Technologies, Inc., requests an order granting the following relief:

1)  Enjoining Defendants and their respective agents and representatives from directly or indirectly, or alone or in concert with others, from disclosing or using, in whole or in part, any of Summit's confidential, proprietary, and trade secret information;

2)  Enjoining Defendants and their respective agents and representatives from directly or indirectly, or alone or in concert with others, from soliciting any business from or perform any services for any of Summit's clients for a period of twelve (12) months from the date of entry of an order;

3)  Directing Defendant Ryon, and his respective agents and representatives, to return all originals and copies of Summit's confidential, proprietary, and trade secret information, and any other property belonging to Summit;

4)  Damages in an amount to be determined;

5)  Pre and post judgment interest;

6)  Punitive damages against Defendants in an amount to be determined;

7)  Attorneys fees and costs; and

8)  Such other legal or equitable relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**


Dated:  April 2, 2009
        Simsbury, Connecticut

THE PLAINTIFF,
SUMMIT TECHNOLOGIES, INC.


By: _____
     James M. Sconzo
     Federal Bar No.: ct 04571
     jms@jordenusa.com
     Thomas J. Finn
     Federal Bar No.: ct 20929
     tjf@jordenusa.com
     Paula Cruz Cedillo
     Federal Bar No.:  ct 23485
     pcc@jordenusa.com
     JORDEN BURT LLP
     Suite 301
     175 Powder Forest Drive
     Simsbury, Connecticut 06089
     Tel.: 860.392.5000
     Fax: 860.392.5058

212376v1